# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISCTRICT OF ALABAMA SOUTHERN DIVISION

| | |
|---|---|
| KAREN KELLY, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| | ) CIVIL ACTION NO.: |
| v. | ) |
| | ) |
| WALKER COUNTY SHERIFF'S | ) JURY DEMAND |
| OFFICE, SHERIFF NICK SMITH IN | ) |
| HIS INDIVIDUAL AND OFFICIAL | ) |
| CAPACITY, TJ ARMSTRONG, and | ) |
| INVESTIGATOR CARL | ) |
| CARPENTER, | ) |
| | ) |
| DEFENDANTS. | |

## COMPLAINT

**I.    Introduction**

Law enforcement is facing a new age of accountability mostly thanks to the fact that we are in the age of ever watchful video recordings. But what happens inside our prisons and jails usually goes unchecked because there are no recordings, and if a recording does exist, it dies with the brutalized inmate before making it into the public eye. Karen Kelly changed that narrative through her actions in this case. She publicized a video of the abuse leading to the death of an inmate named Anthony Mitchell so the horror of his death was not buried with him. When the Sheriff learned Kelly had exposed the crimes of his department, he retaliated and fired her.

1

Kelly worked as a correctional officer at the Walker County Sheriff's office and had just been promoted to an Acting Supervisor position in the Jail. She had passed the Sergeant's exam and was on her way to a promising law enforcement career, which, as a single mother, she needed to care for her children. She gave all that up in order to do the right thing and expose the unfathomable abuse of Anthony Mitchell, a recently incarcerated mentally ill inmate. A spokesperson for the Walker County Sheriff's Office had falsely reported to the media that Mitchell was "alert and conscious" when he left the jail and arrived at the hospital where he subsequently died. Kelly had seen a video that showed that was not true; in fact, Mitchell was unconscious and nearly dead when he left the jail. Kelly could not live with the Sheriff's Office's lie to the public, so she shared her video to make sure that the truth of what happened to Mitchell would not go to his grave with him. When Defendants learned Kelly had leaked the video to the public, they retaliated and fired her.

This is a civil rights action for declaratory judgment, equitable relief and money damages, instituted to secure the protection of and to redress the deprivation of rights secured through the First and Fourteenth Amendments of the United States Constitution via 42 U.S.C. § 1983. Defendants, as a matter of policy and practice, retaliated against Plaintiff for engaging in speech protected under the First Amendment.

## II.     Jurisdiction and Venue

1.     This action arises under the United States Constitution, particularly the First and Fourteenth Amendments, and under federal law, particularly 28 U.S.C § 2201, 42 U.S.C. §§ 1983 and 1988.

2.     This Court is vested with original jurisdiction over these federal claims by operation of 28 U.S.C. §§ 1331 and 1343.

3.     Venue is proper in the Northern District of Alabama Southern Division because the injuries complained of occurred within this district and division under 28 U.S.C. § 13912(b).

### III.    Parties

4.     The Plaintiff, Karen Kelly, (hereinafter "Plaintiff" or "Kelly") is a citizen of the United States, is over the age of (19) and is a resident of Alabama and is a former employee of the Walker County Sheriff's Office.

5.     The Walker County Sheriff's Office was Plaintiff's former employer.

6.     Defendant, Sheriff Nicholas Smith, is the Sheriff of Walker County employed by the Walker County Sheriff's Office and is sued in his official and individual capacity. At all times relevant to this action, Smith acted under color of law. Smith is a policy maker, and his termination of Plaintiff was an act of official policy.

7.     Defendant T.J. Armstrong is the Public Information Officer employed by the Walker County Sheriff's Office and is sued in his individual capacity. At all times relevant to this action, Armstrong acted under color of law.

8.  Defendant Carl Carpenter is an Investigator employed by the Walker County Sheriff's office and is sued in his individual capacity. At all times relevant to this action, Carpenter acted under color of law.

**IV.   Facts**

9.  Plaintiff originally worked for the Walker County Sheriff's Office from September 6, 2020, until September 21, 2021, as a Correctional Officer.

10. After a gap in employment, Plaintiff returned to work for a second stint with the Sheriff's Office in September 2022 as a part time Correctional Officer on the night shift making $13.12 per hour.

11. Plaintiff worked a fluctuating workweek schedule. One week she would work from 6:00 p.m. to 6:00 a.m. for three consecutive nights: Sunday, Monday, Tuesday. The next week she would work those same three days plus Saturday.

12. Plaintiff was also on the C.I.R.T. (Critical Incident Response Team). Occasionally she would get called in to work for a "shake down" of a dorm searching for contraband and would be paid overtime for that work.

13. Plaintiff's direct supervisor was Lieutenant Trina Phillips, the Night Shift Supervisor. On Night Shift Plaintiff was the Acting Sergeant.

14. Plaintiff agreed to become a fulltime employee when the Jail Administrator Justin White told her he would promote her to a supervisor position.

15. On December 7, 2022, Plaintiff began working as an Acting Supervisor Correctional Officer on one of the two night shifts.

16. Plaintiff took and passed the Sergeant test in January 2023, which would have allowed her to move from an Acting Supervisor to a Supervisor in the jail.

17. In January 2023, Plaintiff became aware of an inmate named Anthony Mitchell who had been arrested on January 12, 2023, after a family member had called the police because they were concerned about Mitchell's declining mental health.

18. Mitchell was booked into the Walker County Jail on charges of attempted murder on January 12, 2023.

19. Mitchell was being held in booking cell number 5, also known as the "drunk tank" which was a bare holding cell that had no toilet or bed; it was simply a concrete floor and Mitchell had no clothing other than some paper-thin material. Most of the time, Mitchell was naked in that cell.

20. Plaintiff had been told that Mitchell was in that cell because he was on suicide watch.

21. The last day Plaintiff saw Mitchell was at the end of her shift at 6:00 a.m. on January 25, 2023. Mitchell was sitting on the ground inside of his cell and he spoke to Plaintiff, likely asking for more water, through the cell door as she was clocking out to go home.

22. The next day, January 26, 2023, in the morning, correctional officers carried or dragged Mitchell out of that cell, placed him in an inmate transport vehicle and took him to the hospital where he was pronounced dead after efforts to revive him failed.

23. Plaintiff began hearing talk in the community about what had happened to Mitchell and rumors about what physical state he was in when he left the jail.

24. Plaintiff expressed her concerns about what happened to Mitchell and the condition he was in when he left the jail to Lieutenant Phillips, and Phillips told Plaintiff to search the video to see what happened to him because they (Plaintiff and Phillips) were off work for those days, as that was not their regular shift.

25. As she searched through the video, Plaintiff discovered video recorded at around 8:54 a.m. on January 26th taken in the sally port, which is where inmates are brought in for booking into the jail.

26. This video depicted employees of the Sheriff's office carrying Mitchell in an obvious state of unconsciousness or near death and shoving his limp body into a prisoner transport vehicle, a non-medical police unit.

27. Plaintiff recorded that video on or about January 29th or 30th, 2023, on her cell phone and sent it to Lt. Phillips.

28. Plaintiff told Phillips what she had seen in the video weighed "heavy on her heart" or words to that effect, and if that was somebody in her family, she would want to know the truth of what happened to him, and Lt. Phillips agreed with her.

29. Plaintiff and Phillips discussed the fact that if it was their shift, they would immediately have called RPS (Regional Paramedical Services).

30. A local news source, CBS 42, published an article the next day, January 30, 2023, at 5:57 p.m. CST and updated at 8:40 p.m. that same day concerning the fact that Mitchell had died in custody at the Walker Baptist Hospital in Jasper, Alabama.

31. The article stated in pertinent part as follows:

> Officials with the Walker County Coroner's Office did not respond to requests for comment as of publication time, but the sheriff's office confirmed Mitchell's death in a statement sent Monday afternoon.
> As in most Alabama counties, the local jail is operated by the sheriff's office.
>
> "On Thursday, January 27th, an inmate in the Walker County Jail was provided a routine medical check by jail medical staff. Medical staff determined the inmate needed to be transported to the hospital for further evaluation," the statement said. "The inmate was alert and conscious when he left the facility and arrived at the hospital. Shortly after arrival at the hospital, the inmate suffered a medical emergency and became unresponsive. Life saving efforts were performed by hospital staff and the inmate was ultimately revived. Unfortunately, a short time later, the inmate passed away."
>
> The statement went on to say that because Mitchell's death occurred in police custody, the situation is being investigated by state police.

32. Arthur Leon ("T.J.") Armstrong, Walker County Sheriff's Office Public Information Officer, issued the above statement to Channel 42.

7

33. Plaintiff realized Officer Armstrong had provided a false statement to the media in what appeared to be an attempt to hide the fact that Mitchell was so close to death at the point the Sheriff's office employees finally decided to take him to the hospital that it was too late for him to survive.

34. The video and the false report to the media caused Plaintiff extreme emotional distress, and she needed someone outside of her department to see what had happened.

35. Plaintiff shared her video with a Corrections Officer at another law enforcement agency, because somebody outside of her own employer needed to know the truth of what happened to Mitchell.

36. Plaintiff was also concerned the video would be deleted or recorded over at the Sheriff's office and it needed to be seen by others before that happened so the truth of what happened to Mr. Mitchell would be preserved.

37. Plaintiff understood that sharing this video might result in her being retaliated against by the Sheriff's office, but she thought that the truth of what happened to Mitchell getting out was more important than her own job security.

38. Plaintiff's video quickly began to circulate on social media and people in the community were discussing it.

39. While at work on Tuesday night, February 7, 2023, at around 9:45 p.m., Investigator Carl Carpenter and Officer T.J. Armstrong went to booking to speak to Lt. Phillips to tell her they needed Plaintiff to come upstairs to speak to them.

40. Phillips walked into Central Control where Plaintiff was working and told her to go upstairs because Armstrong and Carpenter were waiting for her.

41. Plaintiff went upstairs and met Armstrong and Carpenter in Sheriff Nick Smith's office.

42. Plaintiff asked if she needed an attorney, and Carpenter told her that she did not because this was an in-house investigation.

43. Carpenter told Plaintiff she could have a witness if she wanted, and Plaintiff said she wanted Lt. Phillips.

44. Carpenter borrowed Plaintiff's radio and called Phillips and told her to come to the Sheriff's office.

45. Carpenter told Plaintiff it had had been brought to their attention that a video has been leaked to the public.

46. Carpenter then told Armstrong to show Plaintiff the video, which he had on his phone.

47. Armstrong played the video before Plaintiff and Phillips.

48. Carpenter asked Plaintiff if she knew the video he had just showed her, and she said yes, and that she had recorded a version of that video.

49. Carpenter asked Plaintiff who she sent the video to, and Plaintiff said she sent it to Lt. Phillips the night she actually recorded it on January 29th or the morning of the 30th, and that she then sent it to another person outside of the department who is also in law enforcement on February 3rd.

50. Carpenter asked Plaintiff where she recorded it, and Plaintiff said she was in central control when she recorded it.

51. Carpenter asked Plaintiff why she leaked the video to someone outside of the department and Plaintiff explained in her own way how she had to share the truth of what really happened to Mitchell as opposed to the coverup story that had been told by the department's representative to the media.

52. Carpenter continued prodding Plaintiff about her leaking the video to the public.

53. Carpenter questioned Plaintiff about her medical background and Plaintiff said she had previously worked as a Certified Nursing Assistant and she had gone through EMT Basic training.

54. Carpenter asked Plaintiff did she believe things might have been different with Mitchell if they had done something else, and Plaintiff said yes, things would have been different. She told Carpenter and Armstrong that Mitchell might have been alive today if they had acted promptly. Plaintiff said that when somebody is in medical distress, the earlier you get treatment the better the outcome.

55. Plaintiff said she felt like instead of putting him in the back of the unit that did not have any life stabilizing equipment the Regional Paramedical Service ("RPS") should have been called to the jail as opposed to waiting several hours and putting him in the back of a corrections transport vehicle unit.

56. Carpenter asked Plaintiff for her phone and its passwords, and he started scrolling through her phone as Armstrong leaned in to look at her phone.

57. Next, Investigator Bryant Parkhurst entered the office and Carpenter handed him Plaintiff's cell phone and told him to get everything off of Plaintiff's phone for them to review.

58. Carpenter continued to question Plaintiff about releasing the video to the public.

59. Carpenter eventually told Plaintiff she could return to the jail, and he would bring her phone.

60. Plaintiff and Lt. Phillips returned to the jail and Plaintiff returned to her post at Central Control.

61. Around 12:00 a.m. on February 8, 2023, Carpenter returned Plaintiff's phone to her and left.

62. Once Plaintiff had her phone back, she saw that she had a missed call from her captain, Arcelia Jottie Tidwell. Plaintiff texted Tidwell and told her she had just gotten her phone back and had seen where she had called.

63. Tidwell called Plaintiff and told her she had just gotten off the phone with Jail Administrator Justin White. Tidwell said White had told her to send Plaintiff home until this investigation into the leaked video was complete.

64. Plaintiff then went home at 12:06 a.m. on February 8, 2023.

65. Plaintiff's video eventually landed in the hands of mainstream media, and the falsity of the statement issued by the Walker County Sheriff's department came to public light.

66. On February 9, 2023, CBS 42 published a second article entitled "Police said an Alabama man was 'alert and conscious' when he left their jail. Video shows otherwise." The article states in part as follows:

> The internal surveillance recording obtained by CBS 42, which lasts just over a minute, shows what the family says appears to be their loved one, Anthony "Tony" Mitchell, being carried into the loading area of the Walker County Jail. Mitchell is limp, his head and feet dangling as uniformed personnel — "Sheriff" emblazoned on one of their vests — lay his body just outside a marked police SUV. In total, four uniformed officials then work to put him into the police vehicle.
>
> The video contradicts an earlier statement from the Walker County Sheriff's Office claiming Mitchell was "alert and conscious" when he left the jail for transport to a local hospital.

67. The next day, on February 10, 2023, Deputy Jaen Lavilette from the Walker County Sheriff's Office, wearing a bodycam that he had turned on, hand delivered a letter to Plaintiff with the subject emboldened at the top stating "Termination of Employment." The letter was backdated February 9, 2023.

68. The letter was signed by Sheriff Nick Smith and stated as follows:

> Pursuant to the appropriate provisions of the Walker County Civil Service Act No. 200, you are considered a probationary employee as you have not been an employee of the Sheriff's Department for (6) months. In other words, your probationary period has not been served. A probationary employee may be discharged for unsatisfactory service at any time before the expiration of the (6) months. You have engaged in certain activities that have been discussed with you which are considered unsatisfactory service for a variety of reasons. I therefore have elected to discharge you as a probationary employee as provided for by Act No. 200 of the Walker County Civil Service Act, effective immediately.

69. Deputy Lavalitte had Plaintiff return her CIRT team bag and equipment.

70. Plaintiff's termination was an act of official policy by the Sheriff, who is the policymaker for the Sheriff's Department.

71. After Defendant terminated Plaintiff, Defendant placed Morgan Madison in her CIRT team position and named him Corrections Officer of the month.

72. Madison helped other officers clean up the cell where Mitchell was being held before Mitchell was removed from that cell, dressed for the first time, and transported to the hospital.

73. Madison is also one of the correction officers who abused Mitchell along with his fellow officers.

74. As a result of Defendants' actions, Plaintiff has suffered damages, including the termination of her employment and all benefits associate with her employment,

lost wages, lost opportunities for future employment, severe emotional distress and fear for her life.

## V. Causes of Action.

### A. COUNT I - First Amendment Retaliation

75. This count is brought against all Defendants.

76. Defendants acted under color of law by virtue of their positions.

77. Defendants retaliated against Plaintiff in violation of the First Amendment because (1) Plaintiff engaged in constitutionally protected speech, (2) Defendants' retaliatory conduct adversely affected the protected speech, and (3) there is a causal connection between the retaliatory actions and the adverse effect on speech.

78. Plaintiff engaged in constitutionally protected speech when she published the video that was a matter of public concern, including the revelation of the extreme abuse of an inmate in violation of the Substantive Due Process Clause of the Fourteenth Amendment to the United States Constitution and the coverup of the Defendants of that abuse of a pretrial detainee.

79. Plaintiff engaged in constitutionally protected speech when she spoke to others about the content of the video and how it contradicted what the department spokesperson said to the media, when she admitted to her superiors that was her video being shared in public, when she told her superiors the reasons she sent it to others and when she said she would have called the paramedics to the jail as opposed

to waiting several hours and putting Mitchell in the back of the non-medical police vehicle.

80. Plaintiff had no private motivation in engaging in this protected speech; rather, she knew there was a chance she would be fired for speaking out and sharing the video but decided the truth being told of what happened to Mitchell was more important than protecting her own private interests.

81. Plaintiff spoke as a private citizen on a matter of public concern rather than as a public employee. Plaintiff did not make this speech pursuant to her official duties; rather, she spoke as a private citizen on matters of public concern.

82. Defendants retaliated against Plaintiff in violation of the First Amendment because their retaliatory conduct adversely affected Plaintiff's protected speech.

83. Defendants took an adverse employment action against Plaintiff because of her engagement in protected speech on a matter of public concern.

84. Plaintiff's termination was an act of official policy by the Sheriff, who is the policymaker for the Sheriff's Department.

85. Defendants' decision to terminate Plaintiff's employment constitutes actions likely to chill the exercise of constitutionally protected speech or deter a person of ordinary firmness from the exercise of First Amendment rights.

86. There is a causal connection between Plaintiff's engagement in protected activity and Defendants' retaliatory actions against Plaintiff up to and including the termination of her employment.

87. Plaintiff's interest as a citizen in commenting upon matters of public concern about the abuse of Mitchell far outweighed any interest the government had in promoting the efficiency of the public services it performs through its employees.

88. Plaintiff's speech through the publication of that video sought to advance political, social, public safety, and other ideas of interest to the community as a whole. All of Plaintiff's speech can fairly be considered as relating to any matter of political, social, or other concern to the community.

89. But for Plaintiff's engagement in protected activity, Defendants would not have taken these adverse employment actions against her up to and including seizing her phone and terminating her employment.

90. Defendants intentionally retaliated against Plaintiff for her engagement in protected activity by taking adverse employment actions against her up to and including terminating her employment.

91. As a result of unlawful retaliation, Plaintiff has suffered damages, including but not limited to severe emotional distress, embarrassment and humiliation, lost employment opportunities, termination of her employment and benefits, and lost wages.

92. Plaintiff seeks punitive damages against the individually named Defendants for their malicious conduct.

## VI. **Damages**

93. Plaintiff is now suffering, and will continue to suffer, irreparable injury from Defendants' unlawful conduct as set forth herein unless enjoined by this Court.

94. Plaintiff has extreme emotional distress, severe emotional and physical pain and anguish, embarrassment, humiliation, shame, damage to reputation, damage to her personal and family relationships, termination of her employment, loss of benefits, loss of income, legal fees, medical expenses, lost earning potential, and other pecuniary losses as a consequence of Defendants' unlawful conduct.

95. Plaintiff has no plain, adequate or complete remedy at law to redress the wrongs alleged herein and this suit for declaratory judgment, injunctive relief, compensatory, and punitive damages is her only means of securing adequate relief.

## VII. **Request for Relief**.

WHEREFORE, Plaintiff seeks the following relief:

1. Award a judgment in favor of Plaintiff against Defendants in an amount in excess of the jurisdictional limits of this court for compensatory damages, including damages for severe emotional and physical pain and anguish, embarrassment, humiliation, shame, damage to reputation, damage to his personal and family relationships, loss of income, legal fees, medical expenses, lost earning

potential, future rehabilitation expenses, future medical costs, future counseling, and other pecuniary losses as a consequence of Defendants' unlawful conduct.

2. Award punitive damages against the individual Defendants sufficient to punish them and to deter further wrongdoing;

3. Award Plaintiff reinstatement into the position she would have held absent the retaliation or front pay if reinstatement is not safe for Plaintiff or otherwise not possible;

4. Grant injunctive relief sufficient to protect Plaintiff from harassment and intimidation of Defendants;

5. Award Plaintiff reasonable attorney fees pursuant to 42 U.S.C. 1988, including a reasonable attorneys' fee for work preliminary to and necessary to the institution of this action;

6. Award Plaintiff all litigation expenses, costs, prejudgment and post judgment interest as provided by law; and,

7. Such other and further relief as the Court deems just and proper.

**THE PLAINTIFF DEMANDS A TRIAL BY JURY
ON ALL ISSUES SO TRIABLE**

DATED: February 13, 2023.   Respectfully submitted,

*/s/ Jon C. Goldfarb*
Jon C. Goldfarb asb-5401-f58j
L. William Smith asb-8660-a61s
Christina M. Malmat asb-1214-y44q
Counsel for Plaintiff

**OF COUNSEL**:
Wiggins, Childs, Pantazis, Fisher,
& Goldfarb, LLC
301 19th Street North
Birmingham, AL 35203
Telephone No.: (205) 314-0500
Facsimile No.: (205) 254-1500